

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

May 4, 2016

By ECF
Hon. Denise L. Cote
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

     Re: *United States v. Vladimir Kats*, 13 Cr. 368 (DLC)

Dear Judge Cote:

  In advance of the sentencing of defendant Vladimir Kats scheduled for May 13, 2016, the Government respectfully submits this letter to advise the Court concerning the assistance that Kats has rendered in the investigation and prosecution of others.

  In light of the facts below, the Government moves, pursuant to U.S.S.G. § 5K1.1, that the Court sentence the defendant pursuant to the factors set forth in U.S.S.G. § 5K1.1(a)(1)-(5).

## I. Indictment and Arrest

  On May 20, 2013, Kats was charged in Indictment 13 Cr. 368 (the "Indictment"), along with co-conspirator Arthur Budovsky, the company they created and ran together, Liberty Reserve, and several other co-defendants, including Mark Marmilev, whom Budovsky and Kats both employed. The Indictment alleged that Kats co-founded Liberty Reserve with Budovsky, and that he helped direct Liberty Reserve after its launch, until he and Budovsky parted ways several years later.

  Kats was arrested at his home in Brooklyn, New York, four days later, on May 24, 2013, as part of a broader law enforcement operation involving the seizure of the Liberty Reserve website and the arrests of its principals. Kats began cooperating immediately upon his arrest. He proffered on numerous occasions thereafter and provided extensive information about Budovsky, Marmilev, and others involved in the operation of Liberty Reserve, as well as his own criminal history. Some of the information about Kats' prior criminal conduct – in particular, his early money laundering schemes with Budovsky before the launch of Liberty Reserve (described further below) – was unknown to the Government before Kats' proffer sessions.

## II. Background and Criminal History

### A. Education and Friendship with Budovsky

Kats was born in St. Petersburg, Russia in 1972. He immigrated to the United States when he was approximately 8 years old, and grew up in Brooklyn, New York. Kats first met Budovsky in about 1991, when Kats was 19 years old and Budovsky was 16 years old. They were both camp counselors at the time, working at a camp located in Brooklyn. They subsequently became close friends.

Kats graduated college from Pace University in 1994, with a major in accounting. After graduating from Pace, Kats attended night school at Brooklyn Law School, while working a day job as a corporate tax accountant – first at KPMG and later at Deloitte & Touche. Kats graduated law school in 1998 and was on unemployment for a number of months before obtaining a job as an individual tax accountant at a small, local accounting practice, Carmine Evangelista, CPA, & Associates. Kats continued working as a tax accountant there until in or about 2002. He also attempted to start his own accounting practice during this time, although the practice never developed much business.

### B. Possession of Child Pornography and Cooperation with Law Enforcement in 1998

In September 1998, while Kats was in his third year in law school, Kats was a target of a child-pornography sweep operation conducted by the U.S. Customs Service. Customs searched his residence based on child pornography downloads that were traced to Kats' home Internet connection. Kats attempted to destroy his computer equipment as agents were trying to enter the premises, but agents were able to recover most of the equipment. Kats subsequently cooperated with Customs and proffered with the U.S. Attorney's Office for the Eastern District of New York. He admitted to being a member of child-pornography chat rooms and to trading child pornography images with other chat room members. In addition to proffering, Kats actively cooperated with Customs for a number of months, chatting online as a confidential informant and eventually meeting in person with one target while wearing a wire. Two arrests were made as a result of his cooperation, including an arrest of a child molester. Kats' online identity was exposed as a result, leading to the conclusion of his cooperation. Kats was never charged in connection with his distribution or possession of child pornography in 1998.

### C. Early Money Laundering Activity with Budovsky

Beginning in about 1999, Budovsky and Kats began to explore ways to make money from laundering other people's money. Among other things, they used a fake charity they created, named "United Support for Humanity," to help others evade taxes. Budovsky and Kats fraudulently established "United Support for Humanity" as a 501(c)(3) organization in 2000. As part of the sham, Budovsky and Kats put up a website claiming that the organization served to "improve the lives of children who are suffering from birth defects, disease, blindness, and poverty." In fact, Budovsky and Kats used bank accounts they opened under the name of this "charity" to accept checks from others; but, instead of applying the money toward charity,

2

Budovsky and Kats would simply return the "donations" in cash to the donors (who knew the charity was a sham), minus a commission that Budovsky and Kats kept for themselves. The donors thus were able to receive a fraudulent tax write-off from the "donation" and thereby conceal the money from the Internal Revenue Service.

Around the same time, from in or about 2000 to in or about 2003, Budovsky and Kats laundered money for medical clinics in Brooklyn and Queens involved in no-fault auto insurance fraud. The medical clinics at issue would pay car accident victims to undergo unnecessary medical tests and procedures, for which they would submit fraudulent insurance claims. These providers needed large amounts of cash make "under the table" payments to people who were involved in the fraud (such as the accident victims). Yet the providers did not want to draw attention from banks by withdrawing large sums of cash from their own accounts; so they recruited others who could cash checks for them – including Budovsky and Kats. Budovsky and Kats agreed to accept checks from these providers and deposit them into shell-company bank accounts that Budovsky and Kats controlled. The names of the companies made it appear that the payments were for legitimate services (*viz.*, technology and accounting services). In fact, Budovsky and Kats would simply deliver cash to the clinics in exchange for the checks, minus a commission that they would keep for themselves.

It was through a similar scheme that Budovsky and Kats became familiar with digital currency. In about 2000, a cousin of Budovsky's, named Ruslan Belanchuk, who was involved in "spamming" for pornography websites, sought Budovsky's help in concealing the proceeds of his activity. Ruslan was paid for his spamming work in the form of "E-Gold," a popular form of digital currency in use at the time. Ruslan asked Budovsky and Kats to help him set up an offshore bank account where he (Ruslan) could instruct E-Gold exchangers to send bank wires when he exchanged his E-Gold for real currency. Kats set up an offshore bank account for Ruslan (under Kats' own name) at a bank in the Bahamas; Ruslan provided him with the initial deposit to open the account. The bank went out of business, however, before Ruslan made much use of the account.

### D. Early Digital Currency Businesses

After being introduced to digital currency, Budovsky and Kats became increasingly interested in the concept. By 2002, Budovsky and Kats were already contemplating forming a digital currency of their own, to be a competitor of E-Gold. Budovsky registered the domain name "libertyreserve.com" for that purpose. They hired a programmer to help them create a website that would essentially copy E-Gold's service. And in May 2002, they announced the anticipated "launch" of Liberty Reserve on a website known as "PlanetGold" – a kind of blog related to digital currency, where Kats, using the pen name "Ragnar Danneskjold," had begun posting interviews of people involved in the digital currency business.

Although the PlanetGold interview stated that Liberty Reserve would launch at the end of May 2002, the programmer that Budovsky and Kats hired for the job did not follow through, and the project was shelved. Instead, Budovsky and Kats turned their attention to operating digital currency exchange businesses. In or about March 2002, Kats acquired an E-Gold exchange business named "GoldAge" for approximately $15,000. Kats invited Budovsky to join him as a

3

business partner, which he did.  Over the next several years, Budovsky and Kats acquired other digital currency exchanges as well, including "Cambist," "Autocambist," "FastGold," and "AsianaGold."  Budovsky and Kats were 50/50 partners in all of these businesses.

In about 2004, Budovsky and Kats hired co-defendant Mark Marmilev to assist them with customer support.  Marmilev's job quickly evolved, however, into a more advanced technical role: he became responsible for programming and maintaining the websites for Budovsky and Kats' digital currency exchange businesses, working with contract programmers in Eastern Europe whom Budovsky hired over the Internet.

Through their operation of "GoldAge" and their other exchange businesses, Budovsky, Kats, and Marmilev became intimately familiar with the world of "high yield investment programs" or "HYIPs" – which they knew to be online Ponzi schemes.  These websites purport to offer various "investment" opportunities (whether they be in stock trading, foreign currency exchange, natural resources, or anything else) that promise patently unrealistic rates of return.  HYIPs overwhelmingly rely on unscrupulous and under-regulated digital currency services as their "payment processors" to collect "investments" from victims – because the payments are irrevocable once made (per policy of the digital currency providers), and because HYIP operators can receive and cash out money through these digital currency services anonymously.

Through the customer support inquiries they received from users, Budovsky, Kats, and Marmilev came to learn that most of the customers buying digital currency through their exchange businesses were purchasing it to be able to invest in HYIPs.  They further learned that most of the customers cashing out large quantities of digital currency were HYIP operators.  For example, when they would receive transfers of digital currency from these users to be cashed out, the names on the digital currency accounts sending these transfers – such as "123Invest" or "Daily Profit" – would reflect that the accounts were associated with HYIPs.

Budovsky and Kats' digital currency exchange businesses grew into profitable enterprises.  In 2003, Budovsky and Kats quit their day jobs and began working full time on running their digital currency exchanges.   By in or about 2006, Budovsky and Kats were each netting approximately $100,000 per year from the businesses.

In the meantime, Budovsky and Kats continued to develop plans for their own digital currency service, Liberty Reserve, which they launched in or about late 2005.

### E. Budovsky and Kats' 2006 Convictions

In December 2005, not long after the launch of the Liberty Reserve website, the offices of E-Gold were raided by federal authorities as part of an investigation into the company for money laundering and operating an unlicensed money transmitting business.  Budovsky and Kats became aware of the E-Gold investigation at the time, as it was reported in the media and discussed on discussion forums that Budovsky and Kats followed.

Approximately six months later, in May 2006, Budovsky and Kats themselves were arrested and their homes searched in connection with an investigation by the Manhattan District

4

Attorney's Office into the operation of their digital currency business, GoldAge – which, by that point, had grown into the largest E-Gold exchanger based in the United States.  Budovsky and Kats were released on bail.  They pled guilty in December 2006 to operating an unlicensed money transmitting business in violation of New York state law, and were sentenced to probation.

Kats also pled guilty to a felony charge of possessing child pornography based on child pornography found on computer devices seized in a search of Kats' residence conducted in connection with his arrest.  Kats received a conditional discharge, dependent on his completing a treatment program.

### F. Operation of Liberty Reserve in the United States from 2006 to 2008

Soon after their arrests, Budovsky and Kats returned to operating Liberty Reserve as well as their other digital currency exchange businesses (*viz.*, Cambist, Autocambist, and AsianaGold).  Budovsky and Kats were well aware by this point that U.S. law enforcement authorities were concerned about the money-laundering risks posed by digital currency companies such as theirs, and that such companies could be prosecuted in the United States if they failed to register as money transmitting businesses and submit to the AML rules applicable to such businesses.  Yet, Budovsky and Kats chose not to register Liberty Reserve or their exchange businesses with federal or state authorities – precisely because they knew it would require them to incorporate effective AML policies, which were anathema to their business model.

Instead, Budovsky and Kats sought to operate Liberty Reserve and their exchange businesses surreptitiously.  For example, they registered the domain names for the websites of these companies under false names or nominees, and otherwise avoided associating their true names with the companies.  They also concealed their involvement in operating digital currency companies from their probation officers, to whom they lied about their sources of employment, and from the IRS, to whom they intentionally failed to report their income from their digital currency companies.

To further insulate themselves from U.S. law enforcement, Budovsky and Kats decided to incorporate and set up bank accounts for Liberty Reserve offshore.  Budovsky and Kats looked for jurisdictions where they believed AML enforcement would be lax.  They settled on Costa Rica, after Kats was introduced to a point of contact there – Ahmed Yassine, whom Kats met online through a mutual acquaintance.  Yassine agreed to act as a nominee for Budovsky and Kats.  Acting at their direction, Yassine filed incorporation papers for Liberty Reserve in Costa Rica and set up bank accounts for the company at Costa Rican banks – listing himself as the owner of the company.  (In return, Budovsky and Kats helped Yassine set up a Liberty Reserve exchange service – "Money Central Market" – and agreed to list it prominently on the Liberty Reserve website.)

Meanwhile, Budovsky and Kats continued to operate Liberty Reserve from their homes in Brooklyn with Marmilev's help.  Together, they grew the business by marketing it to HYIPs.  One of the main ways they did so was by creating their own HYIP discussion forum, where they

sought to promote Liberty Reserve to the HYIP users and administrators they hoped to attract to the forum.  At Marmilev's suggestion, Budovsky and Kats hosted this forum at goldage.net – the same domain name they had previously used to host the "GoldAge" digital currency exchange.  They chose to host the GoldAge HYIP discussion forum at the goldage.net domain name because many of the users of the GoldAge digital currency exchange were HYIP victims seeking to "invest" in HYIPs or HYIP administrators seeking to cash out their proceeds; so the website already had name recognition among the types of users they were seeking to attract.

Budovsky, Kats, and Marmilev used the GoldAge discussion forum to market Liberty Reserve and their digital currency exchange businesses to HYIPs in various ways.  They prominently featured ads on the forum for Liberty Reserve and their exchange businesses.  They posted "sticky" discussion threads (threads that always stayed at the top of the discussion lists) about "HYIPs that accept Liberty Reserve."  And they offered commissions to users of the forum if they could recruit HYIPs to start accepting Liberty Reserve as payment.  Budovsky and Kats' objective was to popularize Liberty Reserve with HYIPs, as they believed that HYIPs would be their most lucrative source of business.

Besides promoting Liberty Reserve on the GoldAge forum, Budovsky, Kats, and Marmilev also promoted Liberty Reserve on other HYIP forums, of which "Talkgold" was the most popular.  Posing as ordinary users of the site (as they knew their posts would be deleted if they were flagged for "spamming" or advertising on the site), Budovsky, Kats, and Marmilev used their Talkgold accounts to promote Liberty Reserve and disparage its competitors.  Through such posts, Budovsky, Kats, and Marmilev sought to draw HYIPs away from Liberty Reserve's competitors, based on the idea that Liberty Reserve was a more hospitable service through which they could conduct their illegal business, because Liberty Reserve lacked AML controls and (supposedly) operated outside the United States.  Liberty Reserve's website even highlighted its position that its corporate administration and bank accounts were not "under US jurisdiction," in contrast to other digital currencies and online payment processors like E-Gold and PayPal.

This marketing strategy paid off, as Liberty Reserve's business started growing in 2007 and 2008, driven by HYIPs.  Liberty Reserve's customer support was handled during this time by Budovsky, Kats, and Marmilev – who always used aliases in their customer support communications as opposed to their true names.  In this role, Budovsky, Kats, and Marmilev would regularly see evidence of HYIP Ponzi schemes cycling through Liberty Reserve's system – marked at the beginning by customer inquiries from users seeking to "invest" in an HYIP and then at the end by customer complaints about the HYIP having run off with their money.  Even when specifically warned ahead of time about a Liberty Reserve account being used by a HYIP Ponzi scheme, Budovsky, Kats, and Marmilev would advise Liberty Reserve users how to send money to the account and then, when they later received user complaints following the HYIP's collapse, falsely tell the users they did not know anything about the account and had never received any complaints about it before.  Budovsky, Kats, and Marmilev would also receive customer support inquiries from HYIP administrators, asking whether Liberty Reserve would limit or block their accounts; they would respond in the negative.

6

Besides HYIPs, Budovsky, Kats, and Marmilev were also aware that digital currencies such as Liberty Reserve were used by "carders" – i.e., individuals engaged in trafficking in stolen credit card information and related crimes. For example, in operating GoldAge, they would notice posts by "carders" discussing websites where users could buy stolen credit card data using Liberty Reserve. Budovsky, Kats, and Marmilev knew that many of the Liberty Reserve features designed to appeal to HYIP operators would also appeal to "carders" and other criminals.

### G.    Budovsky's Emigration to Costa Rica and Split from Kats

Beginning in 2007, as Liberty Reserve's business was starting to grow and significant money began flowing through Liberty Reserve's bank accounts in Costa Rica, Budovsky began traveling to Costa Rica to meet with Ahmed Yassine and to set up an office for Liberty Reserve in Costa Rica. In March 2008, Budovsky told Kats he had decided to move to Costa Rica permanently and obtain citizenship there.

A couple of months later, in late May 2008, Budovsky pushed Kats out of Liberty Reserve. He was in a position to do so because he controlled Liberty Reserve's domain name and technical infrastructure (and had a close relationship with Marmilev, who was in charge of maintaining that technical infrastructure). Budovsky also had direct access to Yassine and, through Yassine, controlled Liberty Reserve's bank accounts and its interactions with Costa Rican banks or financial regulators. In a chat, Budovsky told Kats that he wanted to "restructure" their partnership. Budovsky told Kats that he (Budovsky) was "responsible for all aspects of [Liberty Reserve]" and that Kats had not done enough over the previous two years to deserve to remain part of the business. Kats protested but was not in a position to dictate the terms of the deal because Kats was unable to travel to Costa Rica due to his probation. Ultimately, Budovsky agreed to pay Kats approximately $200,000 to buy him out of Liberty Reserve. As to their other businesses, including their digital currency exchange businesses, they remained 50/50 partners with respect to some of them and others were divvied up between them.

### H.    Kats' Continued Operation of Digital Currency Businesses from 2008 Forward

After being cut out of Liberty Reserve, Kats continued to operate a variety of digital currency businesses. Those businesses included the GoldAge forum (which generated advertising revenue) and the digital currency exchange businesses AsianaGold, Cambist, and Autocambist – although all of these businesses except for AsianaGold eventually ceased operating well in advance of Kats' arrest in 2013. Kats also started up a new digital-currency exchange service known as AbsolutExchange, as well as an alternative digital currency to Liberty Reserve known as "EuroGoldCash," which Kats continued to operate until his arrest but which never attracted much business. Kats' most profitable business was Captain's Games – a Liberty Reserve-based online gambling website, which he ran from 2008 until his arrest, and which generated approximately $4,000 to $6,000 a month in revenue for Kats.

7

Kats never maintained a legitimate job after ceasing work as an accountant in 2002. All of his substantial income after that point came from his operation of illegal digital currency businesses.

## I.     Other Unlawful Conduct

Beyond admitting to all of the foregoing conduct during his proffers with the Government, Kats admitted to other unlawful conduct as well. In particular, Kats admitted to possession of child pornography following his 2006 conviction, which was not known to the Government before Kats' admitted it in his proffer sessions. According to Kats, he ceased collecting child pornography for a while after that conviction, but eventually began doing so again. Kats admitted that the computers that were seized incident to his arrest in May 2013 contained numerous child pornography images that he had collected since 2006. However, Kats stated that he did not distribute any child pornography during this time period. Kats explained that he obtained child pornography through "Freenet," an anonymous file-sharing peer-to-peer network hosting all types of content, which does not specifically require users to upload or share child pornography in order to download it from the network.

Finally, Kats also admitted to preparing false tax returns for himself, Budovsky, and Marmilev while they were working for Liberty Reserve. Specifically, the tax returns he prepared reported minimal income for all of them and specifically failed to report any income they received from Liberty Reserve or their other digital currency businesses.[1]

## III.    Cooperation

Kats has provided substantial – indeed, extensive and highly valuable – assistance in the investigation and prosecution of others, most significantly Budovsky. As set forth below, his cooperation easily satisfies the factors set forth in U.S.S.G. § 5K1.1.

### A.     Significance and Usefulness of Assistance

Kats' assistance was of great significance and usefulness to the Government. Kats provided a complete account of his relationship with Budovsky and how and why they came to create and operate Liberty Reserve. Kats explained how he and Budovsky became involved in rudimentary money laundering schemes as early as 2000 and how their interest in digital currency was piqued by those initial schemes. Kats described the inner workings of the digital currency exchange websites that he and Budovsky ran together and how they knew from operating those websites that their business was driven by criminal enterprises, most significantly HYIPs. Kats told the Government how, after he and Budovsky were arrested in 2006 for operating GoldAge without a license, they doubled down and continued to run their

---

[1] As the Court is aware, Budvosky's sentencing submission included a lengthy discussion about Kats, in which Budovsky made numerous accusations about his past conduct. The Government noted in its sentencing submission for Budovsky that Kats vigorously disputed many of these allegations. The Government understands that defense counsel intends to respond to Budovsky's allegations in the defendant's sentencing submission. Accordingly, the Government will not comment on these allegations except to state that the Government does not credit many of Budovsky's allegations because they are inconsistent with the record in this case.

digital currency businesses – including Liberty Reserve – in secret. Kats detailed the marketing strategy that he and Budovsky developed to promote Liberty Reserve, which involved specifically marketing Liberty Reserve to HYIPs and even going so far as to operate their own HYIP discussion forum. And Kats also explained how he and Budovsky would see evidence of the criminal usage of Liberty Reserve in their day-to-day operation of the business and would do nothing to stop it; indeed, it was the natural consequence of their design and marketing of the business. Finally, Kats fleshed out the role that others played in Liberty Reserve as well, including Marmilev and Yassine.

Kats provided extensive information that was critical to enabling the Government to understand the full history and background of Budovsky's offense conduct. Moreover, much of Kats' information was unavailable from other sources, and came from his unique vantage point as Budovsky's close friend and business partner. For example, no other co-conspirator could have testified about the creation of Liberty Reserve and its early years, or the years that preceded the founding of Liberty Reserve, when he and Budovsky ran GoldAge and other money laundering schemes together. Kats' testimony in this area would have been probative and compelling, because Kats could recount – through extensive personal discussions that he had with Budovsky during this time period (both in person and online) – the genesis and development of Liberty Reserve as a natural outgrowth of their prior criminal ventures together. Hence, Kats' testimony would have been useful to counter Budovsky's anticipated defense that he was not aware of the criminal nature of Liberty Reserve's business when he became involved in the company. In addition, Kats' testimony about this time period was particularly important because the documentary proof of Liberty Reserve's early years was not as extensive as that of its later years after Budovsky had ousted Kats from the company.

Kats also provided a great deal of information that was highly probative of Budovsky's criminal knowledge and intent. For example, Kats explained that when he and Budovsky founded Liberty Reserve, they knew from that HYIPs would be the largest market for Liberty Reserve's services and that they were fraudulent Ponzi schemes. Kats further explained that in order to capture this business (and other criminal business), he and Budovsky marketed directly to HYIPs and designed the features of Liberty Reserve's currency system to appeal to criminals. Kats also confirmed that he and Budovsky moved Liberty Reserve to Costa Rica in order to avoid the reach of U.S. law enforcement and hid their involvement in the company by using nominees like Yassine to register the company and to open bank accounts, among other methods. Kats' information on these points was corroborated by the documents and his testimony would have provided clear evidence that Budovsky intended to run Liberty Reserve as a money laundering enterprise.

Moreover, Kats did not merely provide information in the form of his own statements and memories. Kats reviewed large volumes of discovery materials – including thousands of pages of chats, emails, and bank records – and identified numerous records that corroborated many of his claims. Had Budovsky chosen to go to trial, Kats would have been a key witness for the Government, and some of the corroborating evidence he located would have served as important Government exhibits against Budovsky. In addition, while the Government cannot know what led Marmilev to plead guilty, we believe it was in no small measure due to the fact that Kats had decided to cooperate.

Finally, Kats stood ready to testify against Budovsky at a *Fatico* hearing, if one had been necessary. As he did in proffering and preparing for trial, Kats spent hours reviewing documents and met with the Government on numerous occasions prior to the date of the anticipated *Fatico* hearing to prepare his testimony. For the same reasons discussed above, the Government believes that Kats would have provided credible and compelling evidence against Budovsky on the issues of Budovsky's knowledge and intent, and his role at Liberty Reserve.

### B.  Truthfulness, Completeness, and Reliability of Information Provided

The Government has no doubts regarding the truthfulness, completeness, and reliability of the information provided by Kats. Kats was forthcoming with information during his proffers with the Government. Further, Kats reviewed voluminous materials from his computer and his email accounts concerning matters at issue in the case, in order to refresh his recollection and ensure the accuracy of the information he provided to the Government. The Government was able to corroborate Kats' information based on multiple independent sources.

### C.  Nature and Extent of Assistance

Kats devoted extensive time and effort to assisting the Government. Not only did he proffer with the Government on numerous occasions, but, in preparation for trial, Kats spent many weeks reviewing a variety of documents – including, among other things, hundreds of pages of chats with Budovsky and others, thousands of Liberty Reserve customer support communications, and large sets of financial records. Kats approached this task with diligence and commitment, and not only identified useful documents, but synthesized them and provided them to the Government in an easily digestible format. Through these efforts, Kats identified and helped develop numerous exhibits reflecting Budovsky's criminal knowledge and intent in operating Liberty Reserve that would have served as powerful evidence had the case proceeded to trial, or had a *Fatico* hearing been necessary.

### D.  Injury Suffered, or Any Danger or Risk of Injury to Defendant or Family

Kats was initially housed in the Metropolitan Correctional Center ("MCC") after his arrest in May 2013. Approximately four months later, the Government and defense counsel determined that it was advisable to move Kats to another detention facility due to safety concerns. Specifically, Kats was told by another inmate that Marmilev had been telling other inmates that Kats was cooperating with the Government and had pled guilty to a child pornography offense. Out of concern for possible retribution, Kats was moved to a different facility, where he has remained since then.

### E.  Timeliness of Assistance

Kats' cooperation was timely. As noted above, he began cooperating immediately upon his arrest.

## IV.     Conclusion

Kats has provided substantial assistance to the Government.  His information enabled the Government to develop a comprehensive understanding of the history and background of Liberty Reserve, the roles that Budovsky, he, and Marmilev played in creating and operating the enterprise, and the criminal knowledge and intent that informed their conduct.  The Government believes that the information Kats provided was truthful, complete, and reliable.  Based on all of the facts set forth above, the Government hereby moves, pursuant to U.S.S.G. § 5K1.1, that the Court sentence the defendant in light of the factors set forth in U.S.S.G. § 5K1.1(a)(1)-(5)

                                                                Respectfully,

PREET BHARARA                                       LESLIE CALDWELL
United States Attorney                                  Assistant Attorney General
                                                                Criminal Division

                                                                M. KENDALL DAY
                                                                Chief, Asset Forfeiture and Money
                                                                Laundering Section


By:     _/s/ Christian R. Everdell_              By:     __/s/ Kevin Mosley_____
     CHRISTIAN R. EVERDELL                       KEVIN MOSLEY
     CHRISTINE I. MAGDO                           Trial Attorney
     Assistant United States Attorneys           (202) 598-2801
     Southern District of New York
     (212) 637-2200


cc:      Christopher Flood, Esq. (by email)
         Lyvia Ramos, US Probation Officer (by email)

11